**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| LIFENET HEALTH,<br><br>*Plaintiff*,<br><br>v.<br><br>ZIMMER BIOMET HOLDINGS, INC. and EMBODY, INC.,<br><br>*Defendants*. | Case No. 2:23-cv-00479-AWA-RJK |

**DEFENDANTS' BRIEF SUPPORTING THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....1
II. FACTUAL BACKGROUND ....2
III. ARGUMENT ....5
A. This Court Should Dismiss the Tortious Interference of Contract Claim for Failure to State a Claim ....5
1. LifeNet has not adequately pleaded that Defendants had the requisite knowledge of the agreements (Element 2) .... 6
2. LifeNet has not adequately pleaded that Embody has the requisite intent (Element 3) .... 9
3. There can be no intent to interfere without an actual breach of contract.. 11
4. LifeNet cannot assert that it needs discovery to cure deficiencies in its claim for tortious interference .... 14
B. The Tortious Interference of Contract Claim Is Barred by the Statute of Limitations ....15
1. The alleged acts of interference took place in 2015—not 2018 .... 15
2. The alleged injury began to Accrue in 2015—not 2018 .... 16
3. LifeNet's Amended Complaint should not be afforded the filing date of its original complaint because it raises entirely new allegations .... 17
C. The Tortious Interference of Contract Claim Is Barred by the Doctrine of Laches ....19
D. The Tortious Interference Allegations Are Not Related to ZBH ....21
E. This Court Lack Venue and Personal Jurisdiction Over ZBH, which Is Not a Proper Party to this Lawsuit ....21
1. LifeNet cannot pierce the corporate veil to impute the acts of Embody to ZBH .... 21
2. Venue is not proper over ZBH in this Court .... 24
3. The Court lacks personal jurisdiction over ZBH .... 25
IV. CONCLUSION ....26

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ayres v. Ocwen Loan Servicing, LLC*,
129 F. Supp. 3d 249 (D. Md. 2015) ....................18, 19

*AdvanFort Co. v. Int'l Registries, Inc.*,
No. 1:15-cv-220, 2015 WL 2238076 (E.D. Va. 2015) ....................7

*Andra Grp., LP v. Victoria's Secret Stores, L.L.C.*,
6 F.4th 1283 (Fed. Cir. 2021) ....................23

*Arora v. Sahai*,
No. 1:04-cv-00030, 2004 WL 3606912 (W.D. Va. Nov. 24, 2004) *aff'd sub nom Arora v. Inderneel*, 132 F. App'x 445 (4th Cir. 2005)....................17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................5, 9

*BAE Sys. Mobility & Prot. Sys., Inc. v. ArmorWorks Enters., LLC*,
No. CV-08-1697-PHX-JAT, 2011 WL 1192987 (D. Ariz. Mar. 28, 2011) ....................7

*Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*,
157 F. Supp. 3d 407 (D.N.J. 2016) ....................8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................5

*Chaves v. Johnson*,
335 S.E.2d 97 (Va. 1985)....................6

*Cheatle v. Rudd's Swimming Pool Supply Co.*,
234 Va. 207 (1987) ....................23

*Colt Def. LLC v. Heckler & Koch Def., Inc.*,
No. 2:04-cv-258, 2004 WL 7350327 (E.D. Va. Oct. 22, 2004) ....................23, 25

*Cox v. MAG Mut. Ins. Co.*,
No. 3:14-cv-377-JAG, 2015 WL 1640513 (E.D. Va. Apr. 9, 2015) ....................9, 10, 11, 14

*In re Cray Inc.*,
871 F.3d 1355 (Fed. Cir. 2017)....................24, 25

*Dunlap v. Cottman Transmissions Sys., LLC*,
576 F. App'x 225 (4th Cir. 2014) ....................15

*East Coast Repair & Fabrication, LLC v. United States*,
492 F.Supp.3d 625 (E.D. Va. 2020) ....................12

*Frank Brunckhorst Co., LLC v. Coastal Atl., Inc.*,
542 F.Supp.2d 452 (E.D.Va. 2008) ....................11

*Glover v. F.D.I.C.*,
698 F.3d 139 (3d Cir. 2012)....................18

*Groove Digit., Inc. v. United Bankshares, Inc.*,
No. 3:17-cv-794, 2018 WL 3543055 (E.D. Va. July 23, 2018)....................23

*Henderson Oil Co. Inc. v. Delek US Energy Inc.*,
No. 1:19-cv-00256-MR-DSC, 2019 WL 7560113 (W.D.N.C. Dec. 16, 2019) *report and recommendation adopted sub nom Henderson Oil Co, Inc. v. Delek*, US Energy, Inc., No. 1:19-cv-00256-MR-DSC, 2020 WL 119936 (W.D.N.C. Jan. 9, 2020) ....................7, 8

*Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*,
838 F.2d 124 (4th Cir.1988) ....................16

*Lokhova v. Halper*,
995 F.3d 134 (4th Cir. 2021) ....................5, 7

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)....................13

*Pennington v. Fluor Corp.*,
19 F.4th 589 (4th Cir. 2021) ....................22

*Plumbers & Steamfitters Union Loc. No. 10 v. Waters*,
451 F. Supp. 3d 543 (E.D. Va. 2020) ....................20

*Salley v. Sch. Bd. of Amelia Cnty., Virginia*,
No. 3:20-cv-939, 2021 WL 5760893 (E.D. Va. Dec. 3, 2021)....................10, 11

*Shipman v. Kruck*,
593 S.E.2d 319 (Va. 2004)....................17

*Storey v. Patient First Corp.*,
207 F. Supp. 2d 431 (E.D. Va. 2002) ....................9, 10

*Symbology Innovations, LLC v. Lego Sys., Inc.*,
282 F. Supp. 3d 916 (E.D. Va. 2017) ....................22, 23

*TC Heartland LLC v. Kraft Foods Grp. Brands LLC*,
581 U.S. 258 (2017)....................24

*Transparent GMU v. George Mason Univ.*,
298 Va. 222 (2019)....................22, 23

*Trend Micro Inc. v. Open Text, Inc.*,
No. 1:22-cv-1063, 2023 WL 6446333 (E.D. Va. Sept. 29, 2023)....................26

*Vape Guys, Inc. v. Vape Guys Distrib., Inc.*,
No. 3:19CV298, 2020 WL 1016443 (E.D. Va. Mar. 2, 2020)....................22

*White v. Daniel*,
909 F.2d 99 (4th Cir. 1990)....................19, 20

*Zamma Canada Ltd. v. Zamma Corp.*,
No. 3:20-cv-353-HEH, 2020 WL 7083940 (E.D. Va. Dec. 3, 2020)....................10

*In re ZTE (USA) Inc.*,
890 F.3d 1008 (Fed. Cir. 2018)....................24

**Statutes**

28 U.S.C. § 1400(b)....................24

Va. Code § 8.01-230....................17

Va. Code § 8.01-243(B)....................15

**Rules**

Fed. R. Civ. P. 8(c)....................20

Fed. R. Civ. P. 12(b)(2)....................1, 21, 25

Fed. R. Civ. P. 12(b)(3)....................1, 21, 24, 25

Fed. R. Civ. P. 12(b)(6)....................1, 5, 12

Fed. R. Civ. P. 15(c)....................18

**Other Authorities**

6A Wright & Miller, Fed. Prac. & Proc. Juris. § 1497 (3d ed.)....................18

14D Wright & Miller, Fed. Prac. & Proc. Juris. § 3808 (4th ed.)....................24

## I. INTRODUCTION

Defendants' Zimmer Biomet Holdings, Inc. ("ZBH") and Embody, Inc. ("Embody") (together "Defendants") file this brief in support of their motion to dismiss the tortious interference claim (Count 3) under Fed. R. Civ. P 12(b)(6), and to dismiss ZBH for improper venue and lack of personal jurisdiction under Fed. Civ. P. 12(b)(2), and 12(b)(3), in response to Plaintiff LifeNet Health's ("LifeNet") First Amended Complaint (ECF No. 23). LifeNet filed its amended complaint rather than oppose Defendants previous motion to dismiss LifeNet's original complaint (ECF Nos. 20-21).

LifeNet's amended complaint adds new allegations in an attempt to address the numerous defects in its original complaint that were raised in Defendants' previous motion to dismiss. Indeed, in some cases, LifeNet, realizing the fatal flaws in its original complaint, actually attempts to change its factual allegations. But try as it might to conjure up new alleged facts, these new allegations, which are mostly unwarranted speculation, do not resolve the serious deficiencies with LifeNet's claims.[1] LifeNet's allegations continue to fail because they still do not establish the requisite specific knowledge and intentional tortious conduct *by Defendants* necessary to establish tortious interference.

Rather, LifeNet makes unsupported allegations against two well-respected Embody former employees *years* after the events in question allegedly occurred, and then attempts to improperly conflate these stale allegations against the former employees with a tortious interference claim against Defendants. Given the many years delay in raising these allegations, LifeNet's claims are not only inadequately pleaded but also barred by the statute of limitations

[1] A redline comparing the original complaint (ECF No. 1) and the amended complaint (ECF No. 23) is attached hereto as Ex. 1.

and the equitable doctrine of laches. Indeed, it appears LifeNet only decided to raise its stale claims in an attempt to wrongfully capitalize on the acquisition of Embody by ZBH in 2023, which LifeNet states was for some $155 million dollars—it was only *after* the acquisition was announced that LifeNet sued Defendants.

Finally, even after two attempts, LifeNet's amended complaint provides no evidence sufficient to establish venue and personal jurisdiction over ZBH, which is a passive holding company that owns no real property, has no employees, and is not involved in the operation of any subsidiary, and LifeNet has not come close to establishing the necessary factual predicate to pierce the corporate veil. Accordingly, the Court should dismiss the tortious interference claim (Count 3) of the amended complaint and further move to dismiss all claims against ZBH for improper venue and lack of personal jurisdiction.

## II. FACTUAL BACKGROUND

LifeNet's tortious interference claim stems from work performed by two individuals in the area of electrospinning technology who worked at Embody but were previously employed by LifeNet. Electrospinning is a well-known process for generating ultrafine fibers—it was *not* invented by LifeNet. These two individuals are Dr. Francis and Mr. Kemper. (Compl. at ¶ 15, 37.)[2]

The amended complaint alleges that both Dr. Francis and Mr. Kemper had signed employment agreements with LifeNet. (*Id*. at ¶¶ 34, 37.)[3] The agreements contain an

---

[2] Paragraphs of the amended complaint, ECF. No. 23, are cited as "Compl. at ¶ __." Exhibits attached to the amended complaint are cited as "Compl. at Ex. __." Exhibits filed with this brief supporting the motion to dismiss are cited as "Ex. __."

[3] Dr. Francis's agreement attached as an exhibit to the amended complaint is not signed by LifeNet or dated. (Compl. at Ex. C at 7 of 8.) However, for purposes of this motion to dismiss,

"Intellectual Property" clause, stating that the "[e]mployee agrees never to exploit, challenge, seek to register, or assign or license to any third party, directly or indirectly anywhere in the world, any of the rights owned by, or assigned to, LifeNet Health hereunder." (*Id.* at ¶¶ 36, 39; Compl. at Ex. C at 6 of 8; Compl. at Ex. D at 6 of 11.) Dr. Francis's agreement contained a "Termination and Survivability" clause, stating that the "Intellectual Property" clause survives termination. (Compl. at Ex. C at 6 of 8, § 5.2.) Mr. Kemper's agreement lacks this clause. (Compl. at Ex. D.) Both of Dr. Francis's and Mr. Kemper's agreements were terminable at will. (Compl. at Ex. C. at 2 of 8, § 1.2; Compl. at Ex. D at 3 of 11, § 2.) While employed by LifeNet, these employees were granted two patents related to aligned fibers using electrospinning technology, which were assigned to LifeNet. (Compl. at ¶¶ 25-26, Compl. at Exs. A-B.)

LifeNet alleges that Embody was founded in 2014 in Norfolk. (Compl. at ¶ 40.) In 2015, both Dr. Francis and Mr. Kemper left LifeNet, which LifeNet characterizes as a "not-for-profit" company, and joined Embody, which LifeNet characterizes as a "for-profit company." (*Id.* at ¶¶ 1-2, 41-42.) LifeNet alleges that because they were utilizing electrospinning technology when they joined Embody in 2015, they were "almost immediately" working on LifeNet technology. (*Id.* at ¶ 42.)[4] Thus, according to LifeNet, by working in the field of electrospinning technology when they joined Embody, Dr. Francis and Mr. Kemper allegedly "exploited" LifeNet's technology in violation of their agreements. (*Id.* at ¶¶ 42, 98.) Further, LifeNet alleges that Dr. Francis and Mr. Kemper obtained and assigned to Embody patents that allegedly should have

---

we will assume the exhibit is the final version of the agreement and not a draft and that it was ultimately signed by LifeNet. LifeNet offers no explanation for why it did not provide a signed agreement as an exhibit.

[4] In its amended complaint, LifeNet continues to allege that the exploitation occurred "almost immediately," but now argues that this fact was "unbeknownst to them," a phrase that is repeated in the amended complaint. (*See Id.* at ¶¶ 40, 42.)

been awarded to LifeNet. (*Id*. at ¶¶ 47, 94-95, 97.) The applications for these patents were filed in 2017 and ultimately issued as U.S. Patent No. 10,617,787 (the "'787 Patent") and U.S. Patent No. 11,116,870 (the "'870 Patent") (collectively, "the Embody Patents"). (*Id*. at ¶¶ 43; Compl. at Exs. E-F.) Both Dr. Francis and Mr. Kemper assigned their interests in these patents to Embody on November 19, 2018. (Compl. at ¶ 46.)

As alleged support for its allegation that the Embody patents belonged to LifeNet (and that Embody should have known this), LifeNet points to the prosecution of the Embody's patents, including the '787 patent, where the United States Patent and Trademark Office ("PTO") Examiner discussed a LifeNet patent application where Dr. Francis was the inventor, referred to as "Francis." (*Id*. at ¶¶ 43-44.) However, LifeNet includes in its amended complaint only portions of the prosecution history. A fuller consideration of the prosecution history would have shown that the PTO examined the Francis application and the Embody patent and determined that they *were not the same*, but rather constituted *different* inventions. (Ex. 2 at 3; Ex. 3 at 10; *see also* Compl. at Ex. H at 9 of 12.) Indeed, the PTO Examiner allowed the Embody patent to issue, finding it was patentably distinct and non-obvious even in view of the publication of the LifeNet patent. (Ex. 2 at 3.)

Further, it is noteworthy that all of the above allegations are directed to Dr. Francis's and Mr. Kemper's conduct, *not* Embody's, and certainly not ZBH, which only purchased Embody in 2023. But to establish tortious interference against Embody, LifeNet must show that Embody sp*ecifically knew* of the agreements between Dr. Francis and Mr. Kemper and LifeNet, and that it *specifically intended* to interfere with these agreements, such that the agreements were breached. These are required elements to demonstrate a claim for tortious interference. While LifeNet attempts to conflate the allegations against its former employees into a tortious interference

claim against Embody, the requisite facts are not there to support its claim.

Finally, LifeNet also does not allege any facts sufficient to show that there is venue or personal jurisdiction for *ZBH* in Virginia. ZBH is a mere holding company that does not operate any of Zimmer's businesses, and does not own any real property, or have any employees, much less in Virginia. (Ex. 5 at ¶¶ 3-11.) LifeNet also relies on the fact that ZBH is the parent corporation of Embody to establish and venue and personal jurisdiction. (Compl. at ¶¶ 7-8.) LifeNet, however, does not allege any facts sufficient to pierce the corporate veil or establish that Embody is the alter ego of ZBH, particularly under the exacting standard required in Virginia. For this reason, all claims should be dismissed against ZBH.

## III. ARGUMENT

### A. This Court Should Dismiss the Tortious Interference of Contract Claim for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The plausibility standard is not met unless the "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While the factual allegations are generally taken as true, courts are "*not* bound to accept as true a legal conclusion couched as a factual allegation." *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (emphasis added) (internal quotation marks and citations omitted); *Ashcroft*, 556 U.S. at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Under Virginia law, to establish a *prima facie* case of tortious interference of an existing contract, Plaintiff must show: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985) (citation omitted). "[T]he interferor's knowledge of the business relationship and his intent to disturb it are requisite elements." *Id*. at 102-03. Here, LifeNet has not properly pleaded the necessary facts to establish these elements. LifeNet has, at the least, completely failed to adequately plead elements (2) (knowledge of the relationship) and (3) (intentional interference causing a breach), and thus its count for tortious interference should be dismissed.

**1. LifeNet has not adequately pleaded that Defendants had the requisite knowledge of the agreements (Element 2)**

Concerning knowledge of the agreement and the provisions therein (element 2), LifeNet has failed to plead any facts showing that Defendants *knew* that either Dr. Francis or Mr. Kemper had an agreement with LifeNet, much less the *particular* provisions in these agreements. Initially, it should be noted that ZBH did not acquire Embody until 2023, years after the events alleged in the amended complaint, and the tortious interference count against it can be dismissed on that basis alone. (*See* §III.D., *infra*.)

Recognizing the manifest deficiencies in its original complaint to attribute any knowledge to *Embody* of the agreements between LifeNet and Dr. Francis and Mr. Kemper, LifeNet tries in its amended complaint to cure the defects with unsupported speculation. In particular, LifeNet now alleges that "Embody knew that it was *common practice* for employers

like LifeNet to require its employees performing scientific & engineering research to execute employment agreements containing provisions governing the ownership of intellectual property developed in the course of employment." (*Id*. at ¶ 90 (emphasis added).) In other words, LifeNet concedes that it has no factual basis supporting its allegation that Embody knew about Dr. Francis or Mr. Kemper's agreements, but instead argues that Embody *should have known* because of the marketplace.

But such unsupported conjecture is the very kind of "speculative conclusion" that is insufficient to survive a motion to dismiss. *Lokhova*, 995 F.3d at 148 (affirming dismissal of tortious interference with contract claim and stating that "[i]t is well established that speculative conclusions are insufficient to survive a motion to dismiss"); *AdvanFort Co. v. Int'l Registries, Inc*., No. 1:15-cv-220, 2015 WL 2238076, at * 5 (E.D. Va. 2015)(holding that knowledge element not adequately pled where "Plaintiffs' sole allegation on this element is a barebones, conclusory assertion [that] 'IRI ... had knowledge of these contracts.'")

Indeed, courts throughout the country have specifically rejected such "common practice" arguments as establishing the requisite knowledge of an agreement to establish the intentional tort of tortious interference. *BAE Sys. Mobility & Prot. Sys., Inc. v. ArmorWorks Enters., LLC,* No. CV-08-1697-PHX-JAT, 2011 WL 1192987, at *5 (D. Ariz. Mar. 28, 2011)(the alleged fact that "Armor Holdings was aware that exclusive supply arrangements were commonplace in the industry[]" was not sufficient even if "true," to "establish that Armor Holdings had knowledge about the *specific* ArmorWorks/Alanx supply arrangement")(emphasis added); *Henderson Oil Co. Inc. v. Delek US Energy Inc.,* No. 1:19-cv-00256-MR-DSC, 2019 WL 7560113, at *3 (W.D.N.C. Dec. 16, 2019) ("Conclusory allegations that Defendant was aware of *industry practice* and knew that the Kwik Mart was selling Plaintiff's brand gasoline are insufficient[]" to

establish requisite knowledge for a tortious interference claim)(emphasis added), report and recommendation adopted sub nom *Henderson Oil Co, Inc. v. Delek*, US Energy, Inc., No. 1:19-cv-00256-MR-DSC, 2020 WL 119936 (W.D.N.C. Jan. 9, 2020); *see also Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 422, n.40 (D.N.J. 2016) ("Although Baxter advances the position that HQ *should have known* that a 'sophisticated pharmaceutical company,' like Baxter, would have required contractual arrangements, what HQ '*should have known' is not sufficient for a tortious interference claim*[.]")(emphasis added). This is particularly so where LifeNet does not identify what a "common" agreement would look like or what provisions it would have. For example, as discussed above, Dr. Francis's and Mr. Kemper's agreements are not even the same.

LifeNet further alleges that "Embody has reviewed employment agreements of other LifeNet employees and decided not to hire those LifeNet employees because of provisions in their agreements." (Compl. at ¶ 90.) But this allegation does not relate to Dr. Francis and Mr. Kemper or show why Embody should have known about LifeNet's agreements with them and is thus irrelevant. Indeed, the statement lacks sufficient detail to prove much of anything. LifeNet's amended complaint does not even allege that these "other" agreements contained similar provisions as those in Dr. Francis's or Mr. Kemper's agreements. There is no assertion of *who* these alleged LifeNet employees are, *who* at Embody allegedly reviewed these agreements, *when* they did so (before or after hiring Dr. Francis and Mr. Kemper), or *what* provisions allegedly caused Embody not to hire the employees. Accordingly, even after a second chance, the amended complaint does not adequately plead that Embody *knew* that Dr. Francis and Mr. Kemper had employee agreements or the specific provisions therein. The tortious

interference count should be dismissed on this basis alone for failure to establish a requisite element of the claim, element (2).[5]

**2. LifeNet has not adequately pleaded that Embody has the requisite intent (Element 3)**

Under Virginia Law, a crucial element to establish a claim of tortious interference is that a party raising the claim must demonstrate an act taken by a party with the intent to interfere (element 3). *Cox v. MAG Mut. Ins. Co.*, No. 3:14-cv-377-JAG, 2015 WL 1640513, at *3 (E.D. Va. Apr. 9, 2015) (following *Ashcroft* and dismissing a claim for tortious interference that did not provide sufficient factual allegations to give rise to a reasonable inference of knowledge or intent). LifeNet fails to allege in its amended complaint any act of *intentional interference* on the part of *Embody*.

LifeNet argues that Dr. Francis and Mr. Kemper breached their employment agreements when they assigned to Embody the new technology they invented while working at Embody.[6] Even assuming *arguendo,* for purposes of this motion, that Dr. Francis and Mr. Kemper did in fact breach their agreements with LifeNet, this allegation does not support a claim of tortious interference against Embody. LifeNet still has to plead sufficient facts to show that *Embody, a third party,* intended to interfere with their contracts by inducing the alleged breach through some intentional act: "[A] tortious interference claim requires the existence of three actors—the two parties to the contract *and a third-party who interferes with,* or induces one of the parties to breach, that contract." *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431, 448 (E.D. Va. 2002) (emphasis added) (citing *Fox v. Deese*, 234 Va. 412, 427 (Va. 1987). "In the jurisprudence of

---

[5] As discussed below, *see* § III.A.4., *infra*, discovery cannot cure this defect.

[6] Dr. Francis's agreement is different from Mr. Kemper's in that it has specific termination provisions, and LifeNet does not explain why they should be interpreted in the same way.

tortious interference, it is axiomatic that a party cannot interfere with his own contract." *Id.* at 448; *see also Zamma Canada Ltd. v. Zamma Corp.*, No. 3:20-cv-353-HEH, 2020 WL 7083940, at *3 (E.D. Va. Dec. 3, 2020); *Salley v. Sch. Bd. of Amelia Cnty., Virginia*, No. 3:20-cv-939, 2021 WL 5760893, at *23 (E.D. Va. Dec. 3, 2021).

In its original complaint, LifeNet merely advanced the conclusory and circular allegation that "Embody intentionally *interfered*" with the contract when "Embody *induced* Dr. Francis/Mr. Kemper to breach" the Intellectual Property provisions of their agreements. (Ex. 1 at ¶¶ 91, 94) In its amended complaint, LifeNet attempts to rectify the omission in its pleading concerning the lack of intent by Embody to interfere with LifeNet's contracts by adding allegations that Embody *required* Dr. Francis and Mr. Kemper to assign subject matter they invented while employed at Embody to Embody. (Compl. at § E. at 16 of 34; ¶¶91, 94.) LifeNet does not, however, provide the factual basis for this allegation and such speculation cannot be used to support a claim for tortious interference, even at the pleading stage. *See Cox*, 2015 WL 1640513 at *3; *Zamma*, 2020 WL 7083940, at *3.[7] Nor does it follow that Embody requiring its employees to assign subject matter they invent while working for Embody was intended to do anything with respect to those employees' (unknown) agreements with their past employer.

Finally, the agreements of Dr. Francis and Mr. Kemper clearly state that they are *employees at will* and that the employment agreements can be terminated by either party "at any time, with our without cause, and with our without notice." (Compl. at Ex. C at 2 of 8, §1.2;

[7] Further, such a "requirement" of assignment would have occurred in *2015*, when the employees were hired, not in 2018 when assignment was made. As discussed below, the statute of limitations has thus plainly run for such allegations, which occurred more than five years from when it filed its original complaint in September of 2023, even assuming LifeNet is afforded that date for statute of limitation purposes.

Compl. at Ex. D at 3 of 11, §2.) In Virginia, "when a contract is terminable at will, a plaintiff, in order to present a prima facie case of tortious interference must allege and prove not only an intentional interference that caused the termination of the at-will contract, but also that the defendant employed 'improper methods.'" *Cox*, 2015 WL 1640513 at *3 (citation omitted); *see also Salley*, 2021 WL 5760893, at *23; *Frank Brunckhorst Co., LLC v. Coastal Atl., Inc*., 542 F.Supp.2d 452, 463 (E.D.Va. 2008). Such improper methods include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Id.* at 464. LifeNet has not come close to making any such allegations against Embody, and the claim of tortious interference in the amended complaint can be dismissed on that basis as well.[8]

**3. There can be no intent to interfere without an actual breach of contract**

Without an actual breach of contract, there cannot be the requisite intent to cause that breach. Here, LifeNet's amended complaint fails to establish that Dr. Francis and Mr. Kemper breached their employment agreements. LifeNet alleges that the breach occurred when Dr. Francis and Mr. Kemper assigned their patent rights to the subject matter they invented at Embody to Embody, and not to LifeNet because, according to LifeNet, the patented subject

---

[8] LifeNet may argue that the intellectual property provisions in Dr. Francis's employment contract, as opposed to Mr. Kemper's, survive termination and, thus, this particular provision is not terminable-at-will for him. (Compl. at Ex. C at 6 of 8, § 5.2.) But, there are no pleaded facts demonstrating that Embody was aware that Dr. Francis had an agreement with LifeNet, much less providing the necessary factual predicate to establish that Embody was aware of this specific provision and that it allegedly survived termination. Nor are there *any* facts adequately pleaded in the amended complaint to show an intentional act on the part of Embody to interfere with this specific provision. Further, that Mr. Kemper's agreement contains different clauses negates any speculation about what is "common practice" in the industry.

matter was actually "developed" while they were employed at LifeNet. (Compl. at ¶¶ 46, 92, 95.) But this is not the case.

LifeNet's amended complaint alleges that Embody was aware that the subject matter Embody patented allegedly belonged to LifeNet because the U.S. Patent and Trademark Office ("PTO") raised a LifeNet application during the prosecution of Embody's patents and so this must be LifeNet's work. (*Id*. at ¶¶ 44-45.) But in advancing this argument, LifeNet only included in its amended complaint select portions of the prosecution history.

The prosecution history is the public government record of the proceedings of the PTO. Generally, presenting matters outside the pleadings results in a motion to dismiss under Rule 12(b)(6) being treated as a motion for summary judgment. *East Coast Repair & Fabrication, LLC v. United States*, 492 F.Supp.3d 625, 630-31 (E.D. Va. 2020). There are, however, two exceptions: "courts may consider 'official public records, documents central to the plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.'" *Id.* at 631. The missing portions of the official public record from the PTO of the prosecution of the Embody patents plainly fit both exceptions, and the Court may consider them. Thus, this Court may rely on the omitted portions of the prosecution history in connection with deciding this motion. (*See* Exs. 3, 4, and 5.)

Properly considering these missing portions of the prosecution history shows that the PTO, an arm of the U.S. Government, definitively determined that the technology embodied in the LifeNet patents is *different* from that subsequently patented by Embody, which completely refutes its breach of contract theory. Indeed, the prosecution history further shows that Embody legitimately believed the technology it was patenting was not the same as set forth in LifeNet's patents.

Not only did Embody itself argue in connection with the prosecution of its ’787 patent that the Francis application (LifeNet’s patent application) was not the same technology (Compl. at Ex. H at 9 of 12; Ex. 4 at 11-12; *see also* Compl. at Ex. K at ¶5), but the PTO Examiner also pointed out at least *six differences* between the LifeNet patent application and the technology invented by Embody: “The difference between the instant application and Francis et al. is that Francis et al. do not expressly teach [1] annealed sheet; [2] percentage of collagen and polymer; [3] PDLLA with MW 300K; [4] tensile strength or modulus of elasticity; [5] tenocyte; [6] wrap.” (Ex. 3 at 10.) And the Examiner sought to rely on *seven different references* to try to fill in these gaps. *Id*. Ultimately, the PTO Examiner found that the Embody patents were patentably distinct and not obvious over the Francis LifeNet application in view of these references and allowed Embody’s patent to issue. (Ex 2 at 3.) The PTO Examiner found that there was “no motivation” to make the numerous changes a skilled artisan would need to make to the Francis LifeNet Application to result in the subject matter patented by Embody.[9]

Thus, Dr. Francis and Mr. Kemper did not assign the inventions they had made at LifeNet to Embody. As the PTO has concluded, they made different inventions at LifeNet then at Embody. Proper consideration of the full patent prosecution record proves that Dr. Francis

---

[9] Under 35 U.S.C. § 102, referred to as “anticipation,” an applicant is not entitled to a patent if a “*single*” prior publication within its “four corners . . . *describe every element of the claimed invention*,” and must disclose those elements as “*arranged in the claim*.” *Net MoneyIN, Inc. v. VeriSign, Inc*., 545 F.3d 1359, 1369 (Fed. Cir. 2008)(emphasis added). Thus, while the publication of the LifeNet patent application was raised by the PTO Examiner during prosecution of the ’787 patent, the Examiner did not state that Embody’s inventive technology was anticipated in view of the LifeNet patent application under § 102. Instead, the Examiner relied on 35 U.S.C. § 103, referred to as “obviousness,” which means that there are *differences* between the publication and the subject matter sought to be patented and therefore one would need to *combine different* references to arrive at the claimed subject matter.

and Mr. Kemper could not have breached their agreements with LifeNet by assigning their new patents invented while at Embody to Embody. If Dr. Francis and Mr. Kemper did not breach their agreements, there can certainly be no showing of intent that Embody "required" them to breach. This further negates any inference of intent LifeNet seeks to make in its amended complaint. LifeNet's entire claim for tortious interference claim is based on a flawed premise—that the Embody patents were developed at LifeNet—a premise that the PTO already affirmatively considered and rejected.

#### 4. LifeNet cannot assert that it needs discovery to cure deficiencies in its claim for tortious interference

It is also not enough for LifeNet to claim that it needs discovery to show the requisite acts that are plainly missing from its amended tortious interference claim. Like this case, in *Cox*, the court recognized "the paucity" of the factual allegations that were missing that were necessary to plead tortious interference. *See Cox*, 2015 WL 1640513 at *4. "To get around this problem," the plaintiff there had argued that "'discovery is essential' to show who was involved in the inducement to breach and what they did." *Id*. The court, however, rejected this argument, explaining that "[d]iscovery does not serve as a tool to get basic facts to state a claim; otherwise, anyone who thinks he has suffered harm can file suit, load up the other side with discovery, and hope something shows up." *Id*. (citing *Twombly*, 550 U.S. 544 at 559-60). In this case as well, LifeNet has now had *two* chances to assert its claims, and in each case, the allegations by LifeNet simply do not support the requirements under Virginia law to establish a claim of tortious interference. LifeNet cannot use prospective discovery to fill the gaps in its factually unsupported claim of tortious interference.

### B. The Tortious Interference of Contract Claim Is Barred by the Statute of Limitations

In addition to not adequately pleading the elements of the tort, LifeNet's belated filing of its tortious interference count runs afoul of the statute of limitations. Under Virginia law, a five-year statute of limitation governs the tortious interference of contract claim. *Dunlap v. Cottman Transmissions Sys., LLC*, 576 F. App'x 225, 226 (4th Cir. 2014); Va. Code § 8.01-243(B). LifeNet seeks to base its claim for tortious interference on the assignment date of November 19, 2018, by the inventors of the Embody patents in an effort to avoid dismissal based on the five-year statute of limitations for tortious interference. But there are at least three problems with LifeNet's reliance on the November 2018 date.

#### 1. The alleged acts of interference took place in 2015—not 2018

First, as discussed above, while LifeNet alleges the employees breached their agreements in 2018, LifeNet did not plead any facts to show an intentional act committed by Embody *in 2018* that could possibly constitute tortious interference. The only alleged acts that LifeNet points to in its amended complaint as being committed by *Embody* were hiring the employees and "requiring" the inventors to assign any subject matter invented at Embody to Embody. (Compl. at ¶¶ 41-42, 91.) But Embody hired the employees in 2015, *not* 2018. And, assuming *arguendo* that Embody required Dr. Francis and Mr. Kemper to assign their rights to Embody for subject matter they invented at Embody, such a requirement would have occurred in 2015 when they were first employed, according to LifeNet's own theory of the case. (*See Id.* at ¶ 90.) As such, the acts that gave rise to the tortious interference count occurred in 2015, which is more than five years before LifeNet filed its original Complaint on September 27, 2023.

**2. The alleged injury began to Accrue in 2015—not 2018**

Second, "[i]n Virginia, *only the slightest injury* is required to start the running of the limitations period," and "[i]t is of no consequence that the amount of damages [is] not ascertainable until a later date." *Int'l Surplus Lines Ins. Co. v. Marsh & McLennan, Inc.*, 838 F.2d 124, 129 (4th Cir.1988) (emphasis added) (citation omitted).

After hiring Dr. Francis and Mr. Kemper in 2015, LifeNet asserts in its amended complaint that "*[a]lmost immediately* after Dr. Francis joined Embody (and unbeknownst to LifeNet), Embody began utilizing LifeNet's patented electrospinning technology to develop its own implants for treating soft-tissue injures." (Compl. at ¶ 42 (emphasis added).) LifeNet further alleges that "Defendants have profited from this interference by unlawfully exploiting inventions that rightfully belong to LifeNet." (*Id*. at ¶ 98.) According to LifeNet, this improper "exploitation" of technology caused damage to LifeNet.

Thus, according to LifeNet's own allegations, the alleged breach of contract—the exploitation of the technology—began "immediately" in 2015—more than five years before it filed the complaint. That the employees allegedly wrongfully assigned patent rights to Embody in 2018 is simply an additional alleged injury that flows from the alleged wrongful "exploitation" of LifeNet's purported technology by Embody and does not postpone the running of the statute. See *Int'l Surplus Lines Ins.*, 838 F.2d at 129 (citation omitted) ("Where an injury, though slight, is sustained in consequence of the wrongful or negligent act of another, and the law affords a remedy therefor the statute of limitations attaches at once. It is not material that all the damages resulting from the act should have been sustained at that time and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.") LifeNet cannot pick and choose only those acts that fall within the statute of

limitations to avoid starting the clock earlier, as it has attempted to do here. Accordingly, LifeNet's tortious interference count should be dismissed as barred by the statute of limitations.

Further, in its amended complaint, LifeNet amends it original allegations to now allege that this exploitation occurred, but that it was "unbeknownst to LifeNet." (*See* Ex. 1 at ¶ 42.) But, LifeNet's attempt to change the facts to say that it was unaware of the exploitation does not save its claim. In Virginia, a tortious interference claim accrues "not when the resulting damage is discovered." Va. Code § 8.01-230 (emphasis added). Rather, "[a] tortious interference claim accrues on the date that the injury is sustained." *Arora v. Sahai*, No. 1:04-cv-00030, 2004 WL 3606912, at *3 (W.D. Va. Nov. 24, 2004) (quoting Va. Code § 8.01-230) (emphasis added), *aff'd sub nom Arora v. Inderneel*, 132 F. App'x 445 (4th Cir. 2005). As stated by the Supreme Court of Virginia, "[w]e have followed the general rule that the applicable period of limitation begins to run from the moment the cause of action arises rather than from the time of discovery of injury or damage, and we have said that difficulty in ascertaining the existence of a cause of action *is irrelevant*." *Shipman v. Kruck*, 593 S.E.2d 319, 323 (Va. 2004) (emphasis added). Thus, that LifeNet did not discover the alleged breach, as it now contends, until later in time does not excuse its belated filing of its claim until long after the five-year statute of limitations period has run.

**3. LifeNet's Amended Complaint should not be afforded the filing date of its original complaint because it raises entirely new allegations**

As discussed above, LifeNet filed its original complaint on September 27, 2023, and filed its amended complaint on February 2, 2024. But, the assignment date that LifeNet seeks to rely on in support of its tortious interference claim is November 19, 2018. This date would just be *within* five years of its September 27, 2023, filing but *outside* five years of the February

2, 2024 filing date of the amended complaint. But, LifeNet's new amended complaint raises entirely new allegations that should not legally be allowed to "relate back" to the filing date of its original complaint.

Under Fed. R. Civ. 15(c), there are two requirements for a claim to "relate back" to an earlier pleading: there must be a "factual nexus between the amendment and the original complaint," and (2) the defendant must have "notice of the claim" and must "not be prejudiced by the amendment." *Ayres v. Ocwen Loan Servicing, LLC*, 129 F. Supp. 3d 249, 269–70 (D. Md. 2015). "[O]nly where the opposing party is given 'fair notice of the general fact situation and the legal theory upon which the amending party proceeds' will relation back be allowed." *Glover v. F.D.I.C.*, 698 F.3d 139, 146 (3d Cir. 2012). It is one thing to "amplify the factual circumstances," or provide "greater particularity, but it is quite another when the original complaint does not provide the defendant with "fair notice of the and "the grounds upon which it rests." *Id*. "Pleadings are not like magic tricks, where a plaintiff can hide a claim with one hand, only to pull it from her hat with the other." *Id.* at 148. 6A Wright & Miller, Fed. Prac. & Proc. Juris. § 1497 (3d ed.) ("[I]f the alteration of the original pleading is so substantial that it cannot be said that defendant was given adequate notice of the conduct, transaction, or occurrence that forms the basis of the new claim or defense, then the amendment will not relate back and will be time barred if the limitations period has expired.")

For example, in *Ayres*, and in support of a defamation claim, the plaintiff in its original complaint, alleged that Mrs. Ayres *was* a borrower under what was referred to as the Ayers Note. *Id*. But in the amended complaint, the plaintiff asserted that Mrs. Ayres was *not* a borrower under the Ayres Note and that any of the statements made by Ocwen (the defendant) to the contrary were defamation. For this reason, the court found that amendment did *not* relate to the

original filing because there was not adequate notice of the claim, even though the original complaint and the amended complaint shared a factual nexus. The Court explained that "the Plaintiffs *are alleging new facts* and *basing their allegations* on those facts," and that there "was simply no notice to Ocwen [defendant] within the limitations period that the Plaintiffs would be adopting this new stance." *Id*. at 270 (emphasis added).

Here, LifeNet's originally filed complaint was so deficient and the amendments so substantial on the key required elements of the tort, that it failed to provide Defendants with adequate knowledge about the grounds for its tortious interference claim, and in fact, whether there even was such a claim. LifeNet raises entirely new factual allegations in its amended complaint including, for example, (1) that there was "common knowledge" of employment agreements (Ex. 1 at ¶ 90) in an attempt to satisfy the knowledge element of the tort, (2) that the alleged tortious act committed by Embody was "requiring" its former employees to assign their new inventions to Embody (Ex. 1 at ¶ 91), and (3) that the alleged "immediate" exploitation of their technology in 2015 was "unbeknownst" to LifeNet (Ex. 1 at ¶¶ 40-42), in an attempt to avoid the statute of limitations. These allegations were not pled in LifeNet's original complaint, and Defendants had no notice of them during the applicable limitation period and was unable to respond to them. Accordingly, LifeNet should not be afforded its original filing date of September 27, 2023 of its amended complaint. This is another basis to dismiss the tortious interference claim.

### C. The Tortious Interference of Contract Claim Is Barred by the Doctrine of Laches

To establish laches, the defendant must prove "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *White v.*

*Daniel*, 909 F.2d 99, 102 (4th Cir. 1990) (citation omitted).[10] To establish a lack of diligence, a defendant can show (1) that "the action was not commenced within the period provided by the applicable statute of limitations" or (2) by "facts otherwise indicating a lack of diligence." *Plumbers & Steamfitters Union Loc. No. 10 v. Waters*, 451 F. Supp. 3d 543, 551 (E.D. Va. 2020). Prejudice is further assumed if the complaint is filed outside the applicable statute of limitation period. *Id*.

Here, the only allegations raised against Embody were alleged to occur in 2015, and as such LifeNet did not file its action during the applicable statute of limitation period, which satisfies the lack of diligence element. Instead, LifeNet waited some eight years to assert the claim, three years after the statute of limitations has expired. Thus, LifeNet's tortious interference claim is barred by the doctrine of laches.

Moreover, even if the statute of limitation period had not expired, the doctrine of laches would still bar the tortious interference count. Without explanation, LifeNet delayed filing this lawsuit until years after any of the events alleged in the amended complaint occurred. In fact, it was only after the acquisition of Embody by ZBH, which LifeNet takes care to note in its amended complaint occurred in 2023 and was for $155 million dollars (Compl. at ¶ 61), that LifeNet filed a complaint. But, as a result of this delay, Defendants have clearly been prejudiced. Both Dr. Francis and Mr. Kemper are now former employees of Embody, and memories of the events years ago have faded. Further, if LifeNet had promptly brought suit,

[10] The affirmative defense of laches is applicable in the present action as Plaintiff seeks equitable relief of injunction in relation to the tortious interference of contract claim. (Compl. at ¶¶ 98, § J at 32-34); *see White*, 909 F.2d at 102 ("Laches is one of the affirmative defenses generally allowable under Fed. R. Civ. P. 8(c), although it is properly relevant only where the claims presented may be characterized as equitable, rather than legal.")

then the issue would have been resolved *before* the acquisition of Embody by ZBH for $155 million. As discussed below, LifeNet even goes so far as to try to include ZBH in this litigation, even though none of the allegations in the amended complaint have anything to do with ZBH, occurring well before the acquisition date. LifeNet's failure to bring this claim earlier was unfair and has unquestionably prejudiced Defendants. Accordingly, LifeNet's claim of tortious interference should be dismissed as untimely.

**D. The Tortious Interference Allegations Are Not Related to ZBH**

ZBH is completely absent from any of the allegations raised by LifeNet for its tortious interference count. Indeed, ZBH had no relationship with Embody until 2023. Thus, for this reason as well, Count 3 of LifeNet's amended complaint should be dismissed against ZBH.

**E. This Court Lack Venue and Personal Jurisdiction Over ZBH, which Is Not a Proper Party to this Lawsuit**

**1. LifeNet cannot pierce the corporate veil to impute the acts of Embody to ZBH**

In its amended complaint, LifeNet attempts to pierce the corporate veil in support of its arguments that there is both venue and personal jurisdiction over ZBH in Virginia. But, even in its amended complaint, LifeNet has still not met the requisite heavy burden to do so. LifeNet alleges that "Zimmer [ZBH] has substantively directed and controlled Embody, operating Embody not as an independent subsidiary but instead as part in parcel of Zimmer [ZBH] itself." (Compl. at ¶ 7.) But, contrary to LifeNet's allegations, ZBH, which is the entity that owns Embody and is the named defendant in this action, is a mere holding company.

It is well-established that in evaluating the propriety of venue under Rule 12(b)(3) and personal jurisdiction under Rule 12(b)(2), "a district court may examine facts outside the complaint to determine whether venue" and personal jurisdiction are proper, including the

submission of declarations. *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 924 (E.D. Va. 2017); *Vape Guys, Inc. v. Vape Guys Distrib., Inc*., No. 3:19CV298, 2020 WL 1016443, at *6, *14 (E.D. Va. Mar. 2, 2020). Accordingly, as shown in the declaration filed herewith, ZBH does not own any real property, does not have any employees, and, contrary to LifeNet's allegations (*see* Compl. at ¶ 7) does not operate or manage any subsidiary, including Embody. (Ex. 5 at ¶¶ 3, 4, 13.) Further, ZBH does not make, use, or offer to sell *any* products in this District, or solicit business in Virginia (Ex. 5 at ¶¶ 6-11, 15), as wrongly contended by LifeNet. (*See* Compl. at ¶¶ 7-8.) Further, Embody maintains its own corporate records, files its own tax returns, and maintains ownership of property, including the Embody patents complained of by LifeNet in this action. (Ex. 5 at ¶¶ 14.) These facts sufficiently demonstrate that corporate separateness has been maintained. And contrary to LifeNet's allegations, that ZBH and Embody share officers is not sufficient to demonstrate that the subsidiary is the alter ego of the parent. *See Transparent GMU v. George Mason Univ.*, 298 Va. 222 (2019) (rejecting argument that the fact that two corporations "share common officers" is sufficient to justify piercing the corporate veil).

Where corporate separateness has been maintained, as is the case here between Embody and ZBH, there is no basis to pierce the corporate veil and hold a parent liable for the acts of its subsidiary. *Pennington v. Fluor Corp.*, 19 F.4th 589, 598 (4th Cir. 2021) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries.") (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Indeed, in Virginia, the standard for piercing the corporate veil is even higher, requiring that "to pierce the veil . . . the plaintiff must show that the corporate entity was the alter ego, alias, stooge, or dummy of the individuals sought to be

charged personally and that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212 (1987) (citation omitted); *Transparent*, 298 Va. 222 at 232 (quoting same language); *Colt Def. LLC v. Heckler & Koch Def., Inc.*, No. 2:04-cv-258, 2004 WL 7350327, at *15 (E.D. Va. Oct. 22, 2004) ("Virginia law imposes a high standard for piercing the corporate veil[;] Virginia's more rigorous standard requires proof that the alleged alter ego used the corporation to disguise some legal wrong.") (internal quotation marks and citations omitted); *Groove Digit., Inc. v. United Bankshares, Inc.*, No. 3:17-cv-794, 2018 WL 3543055, at *5 (E.D. Va. July 23, 2018) ("Although Groove alleges that United Bankshares has contacts in the Eastern District of Virginia, these pleadings do not satisfy the alter ego test, which requires (i) a unity of interest and ownership between the subsidiary and the corporation, and (ii) that the subsidiary used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage.'"). LifeNet has not even attempted to make such a showing in its amended complaint.

LifeNet's failure to pierce the corporate veil further dooms its venue and personal jurisdiction allegations against ZBH as well. "[W]here related companies have maintained corporate separateness, the place of business of one corporation is not imputed to the other for venue purposes." *See Andra Grp., LP v. Victoria's Secret Stores, L.L.C.*, 6 F.4th 1283, 1289 (Fed. Cir. 2021) (citations omitted). As stated by this Court, "[s]o long as a formal separation of the entities is preserved, the courts ordinarily will not treat the place of business of one corporation as the place of business of the other." *Symbology Innovations, LLC v. Lego Sys., Inc.*, 282 F. Supp. 3d 916, 933 (E.D. Va. 2017).

**2. Venue is not proper over ZBH in this Court**

Other than its flawed allegations concerning piercing the corporate veil, LifeNet cannot establish that this forum is a proper venue for claims against ZBH, and its complaint against ZBH should be dismissed in its entirety under Rule 12(b)(3).

For the patent counts against ZBH, venue is governed by 28 U.S.C. § 1400(b), which provides that "[a]ny civil action for patent infringement may be brought in the judicial district where [1] the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business." *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 265 (2017) (quoting 28 U.S.C. § 1400(b)). Plaintiff bears the burden of establishing proper venue. *In re ZTE (USA) Inc.*, 890 F.3d 1008, 1013 (Fed. Cir. 2018). Doing business in a district cannot, by itself, support a finding of venue in a patent case. *In re Cray Inc.*, 871 F.3d 1355, 1361 (Fed. Cir. 2017). Further, as is the case here, "if the plaintiff asserts multiple claims against the defendant, venue must be proper for each claim." 14D Wright & Miller, Fed. Prac. & Proc. Juris. § 3808 (4th ed.). Thus, if venue is not proper for the patent claims, all the claims must be dismissed.

ZBH is a Delaware corporation that has its headquarters in Indiana. (Ex. 5 at ¶¶ 2.) It does thus not reside in Virginia under the first part of *TC Heartland*. *TC Heartland LLC*, 581 U.S. at 270. Further, as a passive holding company, ZBH does not make, use, or sell any products (Ex. 5 at ¶ 7), and thus has not committed alleged acts of infringement in Virginia under the second part of *TC Heartland*.

ZBH also does not have a "regular and established place of business" in Virginia. To make this showing, LifeNet would need to demonstrate that "(1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the

place of [ZBH].” *Cray*, 871 F.3d at 1360. In its amended complaint, LifeNet points to properties that it claims are owned by “Zimmer,” which allegedly “include facilities and offices in Winchester and Richmond, as well as manufacturing facilities in Norfolk. ” (Compl. at ¶¶ 12-13.) But these properties are not owned by ZBH, which owns no real property, including in Virginia. (Ex. 5 at ¶¶ 4-5, 16.) And LifeNet’s allegations that ZBH “employs numerous individuals within this District at these locations” is again false—ZBH has no employees. (Ex. 5 at ¶¶ 3, 17.) Nor does ZBH connect its customers with doctors based in Virginia (Compl. at ¶ 12)—ZBH has no customers in Virginia and does not connect them with doctors. (Ex. 5 at ¶ 18.) Accordingly, venue is lacking over ZBH in Virginia and the amended complaint should be dismissed under Rule 12(b)(3).

**3. The Court lacks personal jurisdiction over ZBH**

For essentially the same reasons, LifeNet has failed to plead sufficient facts to establish that this Court has personal jurisdiction over ZBH, and the claims against it can also be dismissed under Rule 12(b)(2). “It is the plaintiff’s burden to establish sufficient grounds for personal jurisdiction, based on the facts alleged in the complaint and any supporting affidavits or other evidence introduced in response to the motions to dismiss.” *Colt*, 2004 WL 7350327, at *8. Here, ZBH has no contacts with the state of Virginia, other than its ownership of the shares of Embody, but this is not sufficient to establish personal jurisdiction. “Complete ownership of a subsidiary that transacts business in the forum is, alone, *insufficient* to deem the parent company also present within the forum.” *Id.* at *14 (emphasis added). Further, as discussed above, LifeNet has failed to establish sufficient facts to pierce the corporate veil.

LifeNet alleges that ZBH sells and offers to sell ActivBraid and Tapestry (the allegedly infringing products) in the District and relies on websites. (Compl. at ¶ 8.) But those links are

not directed to Virginia specifically and thus are not sufficient to establish jurisdiction. Indeed, they are not even offers for sales. "[A] resident's access to a defendant's website does not in and of itself establish minimum contacts, because it is not directed at those customers specifically but instead available to all customers in the United States." *See Trend Micro Inc. v. Open Text, Inc.*, No. 1:22-cv-1063, 2023 WL 6446333, at *10 (E.D. Va. Sept. 29, 2023) (citations omitted). In any event, as set forth above, ZBH does not sell or offer to sell any products. (Ex. 5 at ¶¶ 7, 15.) LifeNet has not made a sufficient showing that ZBH is subject to jurisdiction in Virginia and its dismissal is warranted.

## IV. CONCLUSION

For the reasons discussed above, Count 3 of the amended complaint should be dismissed against both Embody and ZBH, and all the counts of the amended complaint should be dismissed against ZBH for improper venue and lack of personal jurisdiction.

Dated: February 23, 2024

Respectfully submitted,

*/s/ N. Thomas Connally*
N. Thomas Connally (VSB No. 36318)
Hogan Lovells US LLP
8350 Broad Street, 17thFloor
Tysons, VA 22102
Telephone: (703) 610-6100
Facsimile: (703) 610-6200
tom.connally@hoganlovells.com

Jennifer S. Swan (VSB No. 45907)
Hogan Lovells US LLP
855 Main Street,
Suite 200,
Redwood City, CA 94063
Telephone: (650) 463-4111
Facsimile: (650) 463-4199
jennifer.swan@hoganlovells.com

*Counsel for Defendants Zimmer Biomet Holdings, Inc., and Embody, Inc.*